HENRY A. HEIMEYER, Appellant, v. AUGUST A. HEIMEYER.

Division One, June 30, 1914.

FRAUD: Deed From Father to Son: Part of Consideration Omitted. Where a son agreed with his aged father and mother that if they would convey to him their eighty-acre homestead worth $800, which they had occupied for twenty years while rearing their family of six children, he would pay them $100, give them a home and support for life and one-third of the crops produced, and the deed expressed the other items of the consideration, but omitted the obligation to support them, and the weight of the evidence is to the effect that the hundred dollars was not paid, and the grantors received in two years only a few bushels of potatoes and apples, and that the son and his wife by angry mistreatment induced them to be afraid for their safety, in consequence of which they left the home place and took up their abode in the house of a neighbor, the deed will be set aside, as the result of fraud practiced by the son on his parents, and an accounting had,' charging the son with rents, and allowing him for the improvements erected by him.

Appeal from Douglas Circuit Court.—*Hon. John T. Moore,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. S. Clarke* for appellant.

Fraud vitiates the most formal documents. In order to set aside a deed fraudulently procured, it is not

necessary that the grantee wilfully and intentionally perpetrated the fraud in procuring the deed. Derby v. Donahoe, 208 Mo. 699. In this case there was evidently wilful fraud, and wilful misrepresentations made by defendant to secure the making and delivery of the deed to him. Under such conditions the court will apply the most rigid scrutiny, where there is a charge of fraud. Bank v. Fry, 216 Mo. 42; Freeland v. Eldridge, 19 Mo. 375; Creamer v. Bivert, 214 Mo. 473; Reynolds v. Reynolds, 234 Mo. 114. If retaining one-third of the crops grown on the land, and reserving a home by plaintiff, are not grants, but reservations, then the fee simple title did not pass to defendant. ''Something taken back out of that which was granted, as for instance, rents,'' this reservation would prevent fee title from passing to grantee. Myers v. Russell, 124 Mo. App. 317; Hunter v. Patterson, 142 Mo. 310; Walton v. Drumtra, 152 Mo. 489; Railroad v. Frowein, 163 Mo. 1; Moore v. Wingate, 53 Mo. 398; O'Brien v. Wagner, 94 Mo. 93.

*A. H. Buchanan* and *Fred Stewart* for respondent.

(1) While this court is not bound by the finding of the trial court in all cases, it will defer to the lower court's judgment in most instances, and where there is a conflict of substantial evidence will adopt the finding of the court below. And to divest title to land the evidence must be so clear, cogent, definite and positive as to leave no reasonable ground for hesitancy in the mind of the chancellor. Brown v. Fickle, 135 Mo. 405; Forrester v. Scoville, 51 Mo 268; Johnson v. Quarles, 46 Mo. 423; Jackson v. Wood, 88 Mo. 76; Scheilds v. Hickey, 26 Mo. App. 194; Dickson v. Railroad, 168 Mo. 90; Brinkman v. Sunken, 174 Mo. 709; Investment Co. v. Ozenberger, 132 Mo. App. 409; Bolt Mfg. Co. v. Car Co., 210 Mo. 715. And the rule is not different in case of parent and child or husband and wife. McKissock

v. Groom, 148 Mo. 459; Chadwell v. Reed, 198 Mo. 359. Where there is evidence for the jury or trial court to pass upon, the weight is for the trial court to determine, and appellate courts will not undertake to weigh the evidence, but will affirm the decision of the trial court. State v. Wilkes, 170 Mo. App. 180; Bank v. Redfearn, 141 Mo. App. 386; Lindsey v. Stephens, 229 Mo. 600. (2) Plaintiff has alleged fraud and the burden is upon him to prove it. Shoe Co. v. Casebeer, 53 Mo. App. 640; Morgan v. Wood, 38 Mo. App. 255; Albert v. Resel, 88 Mo. 151; Troll v. Spencer, 238 Mo. 81.

WOODSON, P. J.—The plaintiff instituted this suit in the circuit court of Douglas county to set aside and for naught held a certain warranty deed executed by him and wife to his son, the defendant, conveying eighty acres of land, upon the grounds of (a) fraud, (b) undue influence, and (c) failure of consideration.

The defense as stated by counsel is couched in the following language:

"On August 25, 1906, plaintiff executed a general warranty deed to his son, the defendant, conveying the land in suit. Defendant and his family moved on the land and made valuable improvements on it. The evidence shows the land was very unproductive and in a bad state of cultivation and the fences in bad repair when defendant took possession, but after he had devoted two years of his labor and time to improving it and had erected a new house and barn and repaired the fencing, the too common occurrence happened—another son fell out with defendant—and this suit is the result.

"The case was tried at the April term, 1909. The trial court, after hearing the evidence both pro and con, found the issues for the defendant. Plaintiff appealed, but has since died, and the case has been revived by the heirs, or some of them."

Since this is the "old, old story" often repeated, I will tell it in the exact language of the parties and the eyewitnesses thereto; it not being very long.

### PLAINTIFF'S EVIDENCE.

The plaintiff, a German, testified through an interpreter, not being able to speak English, as follows:

"Q. How old are you, Mr. Heimeyer? A. I am eighty years old. I remember having made a deed, with my wife, to August Heimeyer, to a piece of land near town. Q. Tell how you happened to make the deed. A. For one reason I thought I couldn't work any more. I thought I was too old to work and thought by making out the deed to August I could have a living that way. He was to pay me $100 for the land, and one-third of the crops and he was to see I had a living that way as long as I lived, all the time. August was to see we had everything we wanted as long as we lived, that was part of the consideration for making this deed to August. August has not paid the $100 that he agreed to pay, nor no part of it. He says 'a share he gave me this year' I loaned August $50 to make the deed binding, and he paid it right back at the time. August has paid nothing at all on the $100. Q. Why is it you do not live there on the place with August? A. He says 'I used to but August knocked me away,' that is the words he uses in German, the same word for driving away. Q. How did he knock you away? A. The mother, the old lady, went to August's house and wanted to get a little milk and August's wife says yes, and gave her the milk and the mother asked August what was the reason they locked everything up on them. Q. Has August complied with his agreement with you for the transfer of the land? Defendant objects, for the reason it don't make any difference; any contract August has had does not affect this matter; there was a deed made and it passed the title. Which

objection was by the court overruled and defendant excepts to such ruling. A. No, he has done nothing, he wanted to do everything and has done nothing. I had lived on the land twenty years, it is my home, I want to live on the land but I don't know that if I would get land back, I am afraid I would be burned up in the house. Q. Who do you think would burn it? A. I don't know who would do it. I am afraid. I don't know who would do it.'' (He had moved away.)

''Cross-examination.—Q. How much money did you let August have? A. Forty-six dollars, and he counted it right back. He never paid me any more. Q. Has never paid you any more? A. Nothing more. Yes, I was to have one-third of the crops, and a home during my life on the place, and $100. He says he got two bushels of potatoes and four bushels of apples. I did not get any corn, cattle eat it up. No, August has not paid me the $100. I lived one year with August, one year after the deed was made. August got the deed right away. John Victor was there. I don't know whether he read the deed to me in German or English. I stayed there on the place until the women fell out. Q. And that is the reason you left and brought this suit? A. Yes, sir, I had to get away. Q. You brought this suit to set aside the deed because the women folks couldn't get along, didn't you? A. Yes, sir, the women couldn't get along, and with him either.''

John Victor being sworn testified as follows:

''My name is John Victor, I know Mr. Heimeyer, August and all, I live near them. I am a German, I was over to his place some time ago when a deed was made by him and his wife to August. Mr. Pitts came out to take the acknowledgment of the deed. August Heimeyer came to my place that morning when the

deed was made and said I must be a witness for him, and I says 'For what?' and he says, 'I bought father's land,' and I says, 'How much did you pay?' and he says, '$400,' and I says 'What! that is cheap; Mr. White bought that below me for $10 an acre and that ought to be $800.' He told me to go down to Mr. Heimeyer's on the wagon, and I say, 'I walk.' I came in first and the old man and his wife was there and I says, 'You sold your farm to August?' and he says, 'Yes,' and I say, 'You think you are doing right with your other children? I don't think it is fair you don't care for the children,' and he says, 'I am old and sick, and can't work any more, and he gives me part of the crops and takes care of me so long as my life, so I sold it;' and about that time Mr. Pitts and August came in and Mr. Pitts had two deeds made, already, in his pocket, and one read for one dollar, and I says, 'One dollar? August told me $400' and I says, 'That is giving him the land, and when you give anything away there must be some consideration,' and they stopped on it on account of what I say, and then they agree on $100, and I said that 'August told me $400 a few minutes ago,' and he said, 'This is down, and I have to keep the old people and $400 is too much, but I will take it for $100,' and he was talking between the English and German language, and they said, 'Yes,' they were satisfied with $100 and to be kept all their lifetime, and be kept on the place. They executed the deed in my presence, and then August went out and I think the old man went with him out, too, and pretty soon they came in and I says, 'Where is the $100?' Then he borrowed some money, between forty and fifty dollars, and laid it down, and I says, 'That isn't one hundred dollars,' and August said, 'I pay that to-morrow,' and I said, 'Is that right, old man?' and he says, 'Yes,' and after a while August says he has money in the Bank of Ava, and then they signed it and I signed it as a witness, so that was all.

Heimeyer v. Heimeyer.

"Cross-examination.—I am seventy-five years old. I speak and write German language. I was present when Mr. Heimeyer made and delivered the deed to August. He was to pay him $100 and give him a home during his lifetime and paid him something like $40 at the time. I translated the deed to the old gentleman and explained it to both of them, and they were both satisfied. The old people lived there about a year or year and a half. Q. See if this is the deed. A. Yes, sir, this is the deed. I signed that. I saw August borrow that money there. I don't know where he got it, he went out with his father, and I believe his father gave him the money, maybe the mother too."

Frank Heimeyer being sworn testified as follows:

"My name is Frank Heimeyer, I am a son of Henry A. Heimeyer, I heard about the deed after it had been made about a week. Q. What do you know, if anything, about the manner in which your father and mother were treated after you understand this deed was made? Defendant objects. I understood they done very well for a while, but it was soon that August and his wife wouldn't talk to them, just passed around them and kicked the buckets around like they were trying to scare them. The old lady wanted me to bring her out some groceries, but she sent by Ira Sullivan to get the groceries, he gave them to me and I went in the field and met August and he asked if I had any business on the place, and I told him I had a right to go and see the old man, and I didn't take over two or three steps until his wife stepped up with a shot gun and says, 'If you take another step I will fill you full of lead,' that was August's wife. I didn't take any more steps. I went over to Victor's and tried to get them to take the things over to the old people, and they called Herman [Victor] over and laid the law down to them and told them not to come on the place. He didn't get the groceries until he took them out from here [Ava]

in a little red handkerchief. The first crop August made, he had a little there and the old man cut his part up, and the next crop, this last year, he had two or three acres of corn, and when he went after his part it was all gone. The old man said they brought him over a few apples and potatoes and sweet potatoes. The old people live in Mr. Irshmai's house.

"Cross-examination.—Yes, August had a forty-acre tract of land in that neighborhood, and was building a house and quit building that house and moved on this place he got from my father. There was not much fencing when he went on the place and not any more now. There was a barn, smoke-house and crib. August has built a barn and house. My feeling is not very good towards August. Yes, the old people lived with August about two years after the deed was made. I don't know of my own knowledge how they got along up to the time they left the place. The next day after I had the trouble with August's wife the old man slipped away before they got him and he and I and Chriss came to town and saw Mr. Burkhead to get him to bring the suit. I came along to do the talking for him. The eighty is a pretty rocky eighty. There was about twenty acres in cultivation and it made good stuff when the old man had it."

Mrs. John Victor being sworn testified as follows:

"I know Mr. Heimeyer and wife, and August Heimeyer and wife. The old lady came over and asked me if my son would bring some groceries for her from town and I asked him and he went and said he would be willing to do it. I went to see August and he says, 'If they fetch the money from him,' and I promised to let her know and I went to the old people and told them. I know Frank Heimeyer came Sunday morning and had butter and tobacco and he intended to come in and I told him I would not keep it.

"Q. Cross-examination.—When you went up to August and asked if he would bring the groceries, he said he would if the old man would bring the money? A. At first he wouldn't answer me and I asked him again and he says, 'If they fetch the money I will bring them' and I went over and told her. She says 'We can go down to Frank's and he will.'"

Samuel Berger, a witness, being sworn, testifies as follows:

"I know Henry Heimeyer and wife. Yes, I am a German. After the deed was made I went up there one time, I heard they were living hard and I brought them some milk and they told me they hadn't had anything but black coffee and dry bread for a long time. I didn't stay very long; I would have come oftener but I heard the young woman and young man didn't like to have anybody else near, and so I didn't want no trouble. I didn't know anything about the trouble until they came and wanted me to move them in that house. They told me they couldn't live there, they would go out and live in a tent before they would stay there. They moved in my house and live there yet.

"Q. Cross-examination.—You heard they were living hard? A. Yes, sir. Q. And you have also heard they had money in the bank? A. I know they had a little, I don't know how much."

Plaintiff recalled and testified as follows:

"Q. Do you know of August or his wife scratching your wife? A. Right in the neck. Q. Did she leave any blood on her neck? A. There was a little."

Jesse Mitchell, a witness for plaintiff, was sworn and testified as follows:

"Q. Did August Heimeyer have any money in the Bank of Ava, August 25, 1906. A. No, sir, I think not. I would have to look. I don't think he ever had

any since I have been there. At this time the plaintiff and the old lady had some together. Yes, there is some there now, about $150 I believe.''

### DEFENDANT'S EVIDENCE.

Paul Kreisel, a witness for the defendant, being sworn, testified as follows:

''I am a German, I am acquainted with the plaintiff and defendant. August lives on the place he bought from his father. One day August came over to my place and he said he wanted somebody to take that stuff over to him. I taken over five bushels of apples, and about a bushel and one-half of sweet potatoes, some Irish potatoes. This was after they picked the fruit in the fall. Yes, August built a house on the place, a frame house; he built a barn about twenty by thirty feet. The land is poor, thin.

''Cross-examination.—The potatoes and apples were taken to the old folks after they had moved away, after the suit was brought, along late in September.''

Jesse Mitchell, of Bank of Ava, recalled by plaintiff, by agreement of parties says that on the date mentioned awhile ago, there was no money in the bank to the credit of August Heimeyer, defendant.

Sam Foster, a witness for defendant, being sworn testified as follows:

''I am acquainted with August Heimeyer. I know where he lives. I was there with Paul Kreisel and delivered about five bushels of apples, and possibly four or five or six bushels of Irish potatoes and possibly a bushel and one-half of sweet potatoes, to Henry A. Heimeyer. I know he raised some corn on the new ground and he cut part of it up. I saw two rows standing; August told me he left that for the old man. I

consider the land poor; I wouldn't consider it would raise black-eyed peas. The fence was in bad shape where I saw coming to town, it wouldn't turn stock, it is an average with country now. I saw part Sunday, it was in pretty bad shape. There is a pretty fair house, three rooms below, a frame barn."

Maryline Burchell, being duly sworn, testified as follows:

"I am a sister of August's wife. I live about a mile from them. I remember the time August moved there. I have been at August's different times since he has been there. If they ever mistreated the old folks, I never saw it, and I was there more than anyone else. I am acquainted with the place August lives on, it is rocky and worn out, it wouldn't produce an average crop. The fence was in bad condition. Yes, he built a frame house with three rooms; the barn is a frame barn; he repaired the fencing. I saw the Old Lady Heimeyer getting her third of the corn, pulling it off and shucking it."

James Burchell, being sworn, says: "That he was acquainted with the place, that August married his sister, that the place he got from Heimeyer is pretty well worn out. He got part of the logs on this place and some on my mother's place to build the house. We cut a pattern for the house. There was a few come off the Heimeyer place. Fencing pretty well run down."

Maryline Burchell, recalled by defendant for further examination:

"I know that August's father came in and got milk numbers of times, and butter. I do not know of them being in hard circumstances for something to eat. I was there once and twice a week and then again not so often. I saw fat hogs there before they were killed and I saw the meat after they were killed.

"Q. Cross-examination.—He sold this meat to Giz Reynolds? A. I don't know. Q. What year was that, 1907? A. I believe it was 1908. Q. Last year? A. I don't know. Q. Do you know of them buying meat last year? A. No, sir, I don't. I didn't go in the old gentleman's house often."

Joseph V. Pitts, being sworn, testified as follows:

"I am acquainted with Henry A. Heimeyer. I took the acknowledgment to the deed from Henry A. Heimeyer and wife to August A. Heimeyer. This is the deed. I took the acknowledgment at the home of plaintiff; they signed the deed there. August got John Victor to act as interpreter and he was sworn, and they signed the deed after it was explained to them. The interpreter said he asked if they signed the deed as their free act and deed and he replied they did. It took from two to three hours for them to go over the deed before they signed it; they seemed to be in an argument. The interpreter went over the deed explaining it line by line, pointing his finger, and then would stop and the grantors and grantees would argue. I don't think there was any unwillingness to sign the deed; of course I could not understand what they were saying. I delivered the deed to August here in town a day or two afterwards.

"Cross-examination.—Yes, I took two or three deeds out with me. August was in one or two days before that; he wanted me to go out and outlined about what I understood was the deal. That in typewriting I prepared before I went out there, I left the space there to interline. Q. What was that? A. 'Also to furnish them homes on the lands during their natural lives.' "

Defendant now offers the deed in question in evidence, which was a general warranty deed, which need not be set out except the consideration clause, which is as follows:

"Witnesseth: that the said parties of the first part for and in consideration of this party of the second part, giving to said party of the first part one-third of all crops grown and raised on the hereinafter described lands, for and during the period of the natural lives of said parties of the first part, [in ink] 'Also furnish to said parties during their natural lives a home on said lands.' And for the sum of one-hundred dollars to them paid by the said party of the second part, the receipt of which is hereby acknowledged, do by these presents, grant, bargain and sell, convey and confirm unto the said party of the second part, his heirs and assigns, the following described lots, tracts or parcels of land lying, being and situated in the county of Douglas and State of Missouri, to-wit:

August A. Heimeyer, defendant, being duly sworn testified as follows:

"I am the defendant and the son of the plaintiff. My father came over one day to my place, and wanted to make a deal with me, and wanted to know if I would take his place, he said he wasn't able to keep the stock out, and wasn't able to fix the fence and wouldn't spend money to have it fixed, and if he was to, it would take more money than the place was worth. This was two weeks before the deed was made. I was at his place the second time, about a week before the deed was made. When the deed was made there was present Mr. Victor, the old man and old lady, Mr. Pitts and me. Mr. Pitts went there with me. There was $46 paid down. I brought the money from home. I did not get that money from my father or mother that day. It was my money. Q. Did you pay the other since then? A. Yes, sir, the third day. I did not have any money in the bank at that time. I don't remember saying anything to Mr. Victor about having any money in the bank. I built a house, three rooms and two porches, a barn 22 by 32, fourteen feet high on the

lower side, and cleared out five acres and made a quarter of mile of fence and the rest of the fence I fixed up. It is a framed barn. There was twelve or fifteen acres of land in cultivation when I went there. It was poor ground. There was no meadow on the place, I sowed some grass, about eight acres. The reason the old people are not there with me, they got mad and left. I am willing for them to live there like they was. The first year they gathered the crop themselves and the next year I sent the apples and potatoes to them. The cane and hay and tobacco is hanging in his own barn and house. I never said a cross word to them, I never whipped or struck them. I was to pay $100 for the land, money; I paid him the money, and furnished part of the crop as agreed. He killed four hogs the first year after I moved there, they weighed two hundred pounds each, and sold four hams and four middlings to Giz Reynolds; this was 1908.

"Cross-examination.—He sold the meat to Giz in 1908, in February. These were hogs he had before I went there. I did not hear Mr. Victor say anything about paying $400. I told Pitts to put the consideration $100. That was the way the old man wanted it at first. He changed his mind when I came back from town. The old man Victor did not say on the day the deed was made that I told him I was to pay $400 for the land. He never said a word about the $400, but said something about the one hundred dollars being in the deed. I did refuse to permit some of the children to visit the old folks. I did not tell or send Victors word not to come on the place. Never said anything about it to any one. Q. Isn't it a fact that you stood by and saw your wife pestle this old lady with a club? A. No, sir. Q. Didn't you see her scratch this old lady's neck? A. She never touched her. I was there one day when

Frank went over with something to eat for my father and mother. I didn't see my wife draw a gun on Frank. She did not draw one. She did tell Frank not to come another step or she would fill him full of lead. She had a gun in her hand, a musket. He left. I didn't see anything to eat. I saw Frank coming and we went and asked him if he had any business on the place, and he said he thought he had a right to go and see his father. I told him he had better stay away from there.

"Re-direct examination by Defendant.—At the time I moved on this place I had started a building on my own forty acres and I moved the frame and put it up on this place. I told Frank to stay away, because the old man said Frank and Gerber was coming to kill me out, and the next day this suit was brought.

"Re-cross examination.—He told me on Wednesday morning that they would come and kill me out. Q. Had you had any racket with your father? A. No, sir. Q. How come him to tell you they were going to kill you out? A. I reckon he got mad because he couldn't kill my wife and I reckon he was trying to scare me. The old lady came up after a bucket of milk and she filled the buckets up and she began raking us for locking up the house, my own house, I locked the house up because there was a man in the woods there that was stealing; I didn't lock it up to keep the old lady out. I was talking to the old lady when the old man came, and he had a pick handle in his hand, and he drew up the pick handle, and I got around and took that, and he kicked here, and he grabbed a chair and I put my foot on it, my wife didn't pay any attention to it, she kept on skimming the milk. The old man lives about twenty-

five yards from me. By the Court: Q. How many brothers and sisters have you here in this country. A. There is six here. Q. Are you all mad at each other? A. No, sir. Q. How many are you mad at? A. I wasn't mad at any of them at that time. I have never gone to see the old man and old lady since they moved away. They have been away six months.

REBUTTAL.

Henry A. Heimeyer, recalled in rebuttal, testified as follows:

"I did not go to August to get him to come to the place; he come to me. He come the day before the deed was made; that was the only time he came before the day the deed was made. I did not strike, nor attempt to strike, August's wife. I did not kick her, I couldn't do anything, August held me and held me tight. All I could do was to stand still. I was not trying to hit anybody at the time. She (August's wife) had a big pole five feet long and wanted to hit me on the head with it. She struck at me and August held out his arm, and I didn't get the blow. I would be willing to go back there if there was no trouble and fighting. It don't look good to me. Frank didn't have anything to do with our trouble, at all."

This was all the evidence, and set out *verbatim*, as presented by the record.

I. While counsel for appellant present three separate and distinct propositions for a reversal of this case, yet I will consider only one of them, namely: that the deed from the father to the son, the plaintiff to the defendant, was procured by fraud.

I have set out the entire evidence in this case *in haec verba* as preserved in the record; and if there ever was a case where the evidence tends to show that

a son has fraudulently taken advantage of his old father and mother, and turned them out of house and home on an empty promise of support, this is that case.

The appellant and his old wife, eighty and seventy-eight years of age, respectively, not able to speak English, some twenty years ago, entered an eighty acres of land in the hills of Douglas county and procured a patent therefor and lived and reared their family thereon, some six children.

Some twenty years after the entry, when the appellant was eighty years of age, ten years beyond the ordinary three score and ten allotted to the ordinary man, his son—the respondent—approached him, and said in substance, that he, the father, was too old to conduct the farm, and proposed to him that if he, the father, would convey the farm to him, the son, he would, according to some of the evidence, pay him $400, and according to other parts of the evidence, $100, and give the father and mother, the grantors, a home and one-third of the crops raised on the land and support them for life.

Shortly thereafter, from one day to two weeks, the appellants executed the warranty deed, asked to be set aside in this case, for the express consideration therein stated of one-third of all the crops grown upon the land for and during the lives of the grantors to furnish them with a home during their natural lives, and $100 in cash to be paid, omitting therefrom the support of his father and mother, the evidence showed he agreed to do, before the execution of the deed, and evidently thrown out as an inducement for its execution.

This omission, which was the real consideration of the deed, was clearly designed for the purpose of defrauding the appellant, because that, according to all the testimony of both parties, was the real induce-

ment held out for its execution. The appellant testified, that respondent approached him and in substance said: You are too old to manage and run the farm, and for that reason added, that if he would convey the land to respondent he would support him and his wife for life, give him one-third of the crops and pay him one hundred dollars in money.

The respondent's testimony was to the same effect, save he said the appellant approached him upon the subject, instead of his approaching the appellant.

As previously stated this agreement, the real consideration, was entirely omitted from the deed, nor was it preserved in any other written instrument.

Regarding the payment of the one hundred dollars: No unbiased or disinterested person can read this record, without coming to the conclusion that the respondent by a trick or deception beat the appellant out of the greater part of that sum; and as to the delivery of one-third of the crops to the appellant, if not for the seriousness of the situation it would be burlesque.

As we proceed with the opinion I will mention these matters a little more in detail.

This statement of the case alone shows that the son was a dreamer, or was trying to take advantage of the appellant, I believe the latter for the reason that the record shows that he possessed ordinary intelligence (not needing a guardian to look after his interests) and, therefore, would not have made the contract which the evidence clearly shows he did, without it was for the purpose of inducing his father and mother to execute the deed in question, when he knew that the farm, which the evidence shows was not worth more than $800, would not, after one-third of the crops were given to the grantor, support the grantees and the father and mother, and enable him to pay $100 purchase money mentioned in the deed.

This may have had something to do with the fact that the moneyed consideration mentioned was reduced from $400 to $100, and the payment of the latter was made in chips and whetstones, if at all.

But the evidence does show that the land would do just what the respondent actually did with it, as appears from this record, namely, by taking all of the crops produced upon the land except the few bushels of apples, potatoes and corn to be presently mentioned, not to exceed eighteen or twenty bushels, all told, furnished the respondent and family a living and the means with which to construct the buildings on the farm mentioned in the evidence.

The evidence for the appellant is uncontradicted to the effect that he reared his family upon the farm, and besides saved up a little money therefrom; but according to the respondent's theory of the case, the land was rocky, worn out and would not sprout "black-eyed peas;" and if respondent made an honest distribution of the products of the farm during even the last year of his possession before this suit was brought, it did not produce more than eighteen bushels of apples, twenty bushels of Irish potatoes, four and a half bushels of sweet potatoes and six rows of corn, the length of which is not shown. I say this, for the reason that the record clearly shows that respondent only delivered to appellant about six bushels of apples, six bushels of Irish potatoes, one and one-half bushels of sweet potatoes, and two rows of corn, the length not given.

If that is true, why does the respondent want to keep the farm and offer, as he does in his testimony, to furnish appellant and his wife a home and support them for life and give them one-third of the crops raised on the land as long as they live, as he states in his evidence he is willing to do, if they will only return to the old homestead?

Such a contention, under the evidence and physical facts of this case, is puerile, and it seems to me to be unworthy of serious consideration.

If the land is so worthless as respondent would make it appear and he has been so grievously injured by the contract, I again ask the question, why does he so strenuously adhere to it and insist upon fulfilling the contract according to the letter and spirit thereof? There is but one honest and candid answer to this question, and that is, the son took advantage of the father and mother and by the means indicated relieved them of their homestead for a promise of support, etc., and has never furnished or paid the consideration intended at the time the promise was made.

A further consideration of this question would dignify the bare-faced fraud so boldly perpetrated upon these old people by the respondent.

In my opinion, the judgment should be reversed and the cause remanded to the circuit court with directions to set aside the deed and to take an accounting between the parties charging the respondent with the rents and profits of the farms and credit him for the taxes, if any, he has paid and the reasonable value of the improvements he has placed upon the premises.

It is so ordered. All concur. *Lamm, J.,* in result.